UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT WHITTEN et al,

      Plaintiffs,                   Case No. 1:11cv889

vs.                                 Judge Weber
                                Magistrate Judge Bowman

FENNER DUNLOP CONVEYOR
SYSTEMS AND SERVICES, INC.,

      Defendant.

**REPORT AND RECOMMENDATION**

Plaintiffs Robert Whitten and Daryl Spencer ("Plaintiffs") bring this action through counsel against Defendant Fenner Dunlop Conveyor Systems and Services, Inc., ("Fenner") asserting claims for disability discrimination and wrongful termination in violation of Ohio Rev. Code § 4112.02(A) and § 4113.01. This matter is now before the Court on Defendant Fenner's motion for summary judgment and supporting attachments and depositions (Doc. 40, Ex. 1-2; Docs. 30-37); Defendant's proposed undisputed facts (Doc. 41); and Plaintiffs' memorandum *contra* and supporting attachments and affidavits, including their response to Defendant's undisputed facts. (Doc. 43, Exs. 1-23, Docs. 44-46). Defendant's motion for summary judgment has been referred to the undersigned for initial consideration and a report and recommendation. 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I now recommend that the Defendant's motion for summary judgment be GRANTED.

## I.    Background and Facts

### A.  *Fenner's Business and Plaintiff's Employment*

Fenner's business is the service and repair of conveyor belts installed in mines owned by third-party energy companies.  Fenner's roster of Field Service Technicians travel to mines located primarily in Pennsylvania and West Virginia to service and repair industrial conveyor belts.  (Doc. 40, Ex. 1, Affidavit of Dennis Edward Tate ¶2.)

Spencer and Whitten were employed by the Defendant, Fenner, at its Sabina, Ohio. They were hired in May and August of 2007 respectively by Fenner's predecessor Conveyor Services.  (Doc. 41 at ¶ 2; 43 at pg.1).  They were hired initially to serve as helpers on splice jobs, and in this role, they were required to do whatever the senior man asked or told them to do.  *Id.*; (Doc. 32 Whitten Dep. p. 34).  In their role as helpers, each also received on-the-job training and experience on how to perform a splice. (Doc. 33, Spencer Dep. p. 18; Doc. 32, Whitten Dep. p. 34).  Both performed well and were each eventually promoted by Defendant to the position of technician. (Spencer Dep. p. 19; Whitten Dep. p. 37).  Their official title was Tech 2.  (Machak Dep. p. 23).

The service work is usually performed on weekends and nights when the mines are able to shut down portions of their elaborate conveyor belting system. (Spencer Dep., at 20; Whitten Dep. at 41).  While there is no regular schedule for these jobs, since they occur as mines need their conveyor belts serviced, Fenner employees are usually notified during the workweek of the job site where they will be working that weekend. (Spencer Dep. 21).  Since the mines generally need to get a belt up and running again as soon as possible to avoid disrupting operations, Fenner crews remain

on the job as long as necessary to complete the repair work, taking anywhere from four hours to more than 20 hours. (Doc. 37, Machak Dep. at 19; Spencer Dep. 17.)

The planning for a job begins when a mine sends Fenner, through its sales representatives, a work order.  (Doc. 34, L. Tate Dep. 22).  Based on the extent of the work order, Fenner schedules a lead employee—a crew leader—and an appropriate number of technicians.  (L. Tate Dep. 22).  The crew for each job is usually three to five employees, including the crew leader.  (Doc. 35, D. Tate Dep., at 9).  A job begins with the crew's drive to the mine, which is paid time.  (L. Tate Dep. 22).  Usually, the crew takes turns driving and sleeping while they travel to the mine.  (L. Tate Dep. 22).

If the work order indicates that the job will be an extended job, meaning that it will likely take more than 12 hours of work within the mine, Fenner schedules a relief crew to replace the original crew after 12 hours. (Machak Dep. 24; L. Tate Dep. 22-25; Spencer Dep. 22; Whitten Dep. 30-31, 46-47).  Jobs that are expected to take less than 12 hours can often take longer, however, if the technicians encounter unanticipated delays at the mine site, such as power outages, water disruptions, or transportation issues. (L. Tate Dep. 22-23; D. Tate Dep. 14; Spencer Dep. 22).  In those cases, since the job was not anticipated to take more than 12 hours, no relief crew will have been scheduled, and the original crew remains in the mine and completes the job.  (L. Tate Dep. 22-23; Spencer Dep. 21).  If the crew believes that the job will take much more than 12 hours and no relief crew is scheduled, they may call any number of Fenner managers to request a relief crew. (D. Tate Dep. 15-16; Machak Dep. 47; Spencer Dep. 25).

While there is no set company policy limiting the length of shifts, Fenner adopted a policy that requires employees who have worked for more than 16 consecutive hours to rest at a hotel for 10 hours before driving home. (D. Tate Dep. 30; Machak Dep. 46; Pl. Exh. 2). This policy is based upon a Department of Transportation ("DOT") regulation requiring such a rest period for those employees who drive commercial vehicles. *Id.* Fenner's employees, however, typically drive non-commercial trucks to job sites and thus are usually not subject to the DOT regulation. *Id.* Nevertheless, Fenner pays for hotel rooms on all jobs involving travel, to ensure crews sufficiently rest before traveling home. (Spencer Dep. 26; Whitten Dep. 50-51).

While the crew is in the mine working at their job site, a CONSOL mine employee is assigned to escort them. (Gilbert Dep. 16; Spencer Dep. 34; Whitten Dep. 71). The mine's union protocol calls for a unionized mine employee, sometimes referred to as a "babysitter" by Fenner crews, to escort Fenner crews through the mine and remain with them the entire time they work at a job site. (Gilbert Dep. 16; Spencer Dep. 34; Whitten Dep. 71-72). The escort generally stays within 10 to 20 feet of the crew so that he can see and hear the crew to make sure that they are working consistently and safely. (Spencer Dep. 42). Fenner employees are trained to refrain from voicing complaints or concerns to the mine escort, as the mine escort is an employee of Fenner's customer. (Gilbert Dep. 36; Spencer Dep. 35). Further, there is some friction between the miners, who are unionized, and Fenner's employees, who are not. (Gilbert Dep. 36; Spencer Dep. 35; Whitten Dep. 72-73). Accordingly, the job description for service technicians expressly requires them to "act professionally while traveling or while in the field." (Tate Aff. ¶2, Appendix A, job description).

4

In the event that Fenner employees have concerns at a job site, they are instructed to address these complaints internally within the company.  Indeed, a laminated list of phone numbers of various Fenner employees, which includes members of management, is given to every employee, technician and crew leader alike. (Spencer Dep. 50, Exh. A; Whitten Dep. 93, Ex. A).

### B. *Plaintiffs' Medical Conditions*

Prior to joining Fenner, both plaintiffs were diagnosed with bipolar disorder, a fact that they freely shared with their coworkers in casual conversation. (Spencer Dep. 14; Whitten Dep. 21-23, 24-25).  As a result of their conditions, Plaintiffs would experience fluctuating mood swings resulting in periods of over-excitement and mania and periods of depression.  (Spencer Dep. p. 15; Whitten Dep. pp. 19-20).  Both would routinely become stressed out by the requirements of their jobs, especially if things went wrong, and would need to step away from the conveyor belt they were repairing and collect themselves.  *Id.*  Whitten testified that he talked openly about his bipolar disorder during "casual conversations" with his co-workers.  (Doc. 32 at 23).  Whitten testified that that he asked Butch Widget, a scheduler for Fenner, not to be scheduled with certain people Whitten did not get along with, including David Gilbert.  (Doc. 32 at 24). Whitten testified that he never made any other requests.  *Id.*  Spencer's testimony also states in relevant part:

> Q. …Did you ever go to [the general manager] and say, "I can't work this job because of my bipolar. I need an accommodation?
>
> A.  No, ma'am.
>
> Q. Why not? You didn't think you need an accommodation?
>
> A. I didn't think I needed it.

Q. Did you ever ask to have your work hours limited because of your bipolar?

A. No, ma'am.

Q. Did you ever ask not to have to travel to mines because of your bipolar?

A. No, ma'am.

(Spencer Dep. 14,16.)

Both plaintiffs also testified that due to their bipolar disorder, they would occasionally become angry or frustrated and needed time to calm down. (Spencer Dep. 15, 27; Whitten Dep. 28-29). They also both testified that when that occurred, they were free to walk away from the belt they were working on until they had settled down. (Spencer Dep. 15; Whitten Dep. 98-99). In fact, they testified that they had done that on numerous occasions. *Id*.

### C. September 2011 Incident

The controversy of the instant case began on September 16, 2011 when the Plaintiffs were notified of a job the following day at a CONSOL mine in Blacksville, West Virginia to perform a splice in a conveyor line. (Doc. 41 at ¶ 12; Doc 43 at 6). On this particular job, and despite Whitten's request not to be scheduled with Gilbert, Gilbert was assigned as the lead man on the crew. (Spencer Dep. pp. 40, 50).

On Saturday, September 17, 2011, Plaintiffs and Gilbert reported to Defendant's Sabina location at 4:00 p.m. and proceeded to make the roughly five-and-a half-hour drive to the Blacksville mine together. (Gilbert Dep. pp. 11, 14; Spencer Dep. pp. 29-31). Defendant had scheduled this particular splice job in the past and estimated that it

would take between 12 and 14 hours to complete.  (Machak Dep. p. 40).  Thus, per company policy, no relief crew was scheduled.  *Id.* at p. 41.

The five and a half-hour drive from Ohio to West Virginia was without incident, but once the crew reached the job site, they experienced several delays. (Gilbert Dep. 14, Exh. 3).  First, because of the delayed arrival of the mine escort and the Jeep transport for their equipment, it took approximately two hours for them to get their equipment to the underground job site when it should have only taken up to 20 minutes. (Gilbert Dep. 14, 26-27; Whitten Dep. 68-69).  Second, at the job site, the press used for the splice had not been set up by the CONSOL as the crew expected, and so they had to move it.   (Gilbert Dep. 14; Spencer Dep. 36; Whitten Dep. 75).  Additionally, they later had problems with the conveyor belt's running speed, which compounded the delays. (Gilbert Dep. 14-15, 28; Spencer Dep. 44).  Even later, they had delays due to the power outages at the mine and the mine's inability to get water to cool the splice. (Gilbert Dep. 14-15, 28; Spencer Dep. 44; Whitten Dep. 77, 87).

As soon as the crew reached the work site, Whitten began complainting about the length of job, even before the crew faced the delays caused by the conveyor belt running speed, the power outage and the water outage. (Whitten Dep. 66).  As the crew worked, Whitten continued complaining about the delays and he objected that the job was taking longer than he believed was necessary. (Gilbert Dep. 18).  Whitten was complaining well within earshot of the mine escort. (Spencer Dep. 45-46).

As noted above, Whitten did not like working with Gilbert and had previously asked to not be scheduled to work with him.  (Whitten Dep. 60).  As Whitten continued with his complaints, Spencer also became agitated and joined in on the complaining,

7

stating that he would not work more than 16 hours either.  (Gilbert Dep. 19-20; Spencer Dep. 47-48).

Whitten voiced his complaints not only to Gilbert, but also directly to the CONSOL mine escort assigned to stay with them. (Whitten Dep. 101-12; Gilbert Dep. 16-17, 25, 35).  He claimed that there was a law that prohibited them from working more than 16 hours at a time. (Whitten Dep. 83; Gilbert Dep. 21-23).  He also complained to the escort about his pay rate, as well as the way that Gilbert was leading the job. (Whitten Dep. 90-91; Gilbert Dep. 25).

In response to Whitten's complaints, Gilbert asked Whitten what he wanted to do to resolve the issue, and Whitten told Gilbert that he was going to walk out of the mine once 16 hours was up, which would have been at noon on Sunday (by his calculation1), regardless of whether the job was done.  (Gilbert Dep. 17-18, Pl. Exh. 8).  Spencer joined in with Whitten, stating that he too would walk out after 16 hours.  *Id.*  Gilbert then called his field supervisor, Lonnie Rollins, for advice on how to proceed.  (Gilbert Dep. 17; Whitten Dep. 81-82).

At the time, Rollins was working at a different work site within the same CONSOL mine. (Gilbert Dep. 34).   Based on Gilbert's description of the job's status, Rollins advised that since the crew did not have much work left to do, Gilbert should have the crew resume working but continue to monitor the situation and contact Rollins again if there were any further issues.  (Gilbert Dep. 17).  Rollins told Gilbert that he would help him finish the job if Plaintiffs did, in fact, walk out at noon and the job was not complete. (Gilbert Dep. Pl. Exh. 8).  At no time did Gilbert tell the plaintiffs they could not leave, as they were threatening to do. (Gilbert Dep. 18; Spencer 48-49).  Following the phone

call, Spencer revised his walk-out time, asserting he was going to walk out if the job was not complete by 2:00 p.m. on Sunday. (Gilbert Dep. Pl. Ex. 8). Gilbert called Rollins back at 10:00 a.m. on Sunday and explained that plaintiffs were still planning to walk out, and Rollins promised to help Gilbert complete the job once he was done with his own job. (Gilbert Dep. Pl. Ex. 8).

A short time later, the CONSOL mine escort told Gilbert that he needed to call Rollins again. (Gilbert Dep. Pl. Ex. 8). During that call, Rollins informed Gilbert that the mine's shift foreman, CONSOL's supervisory employee, had heard about plaintiffs' complaints and was upset about plaintiffs' behavior. (Gilbert Dep. Pl. Exh. 8). Rollins asked Gilbert again if he needed to help Gilbert finish the job. *Id.* Gilbert reported that Spencer had cooled down and had agreed to finish working, but Whitten was refusing to say whether he would continue working after noon. (Gilbert Dep. Pl. Exh. 8; Spencer Dep. 48-49). Rollins responded that the mine foreman was going to be removing Whitten and possibly Spencer from the mine. (Gilbert Dep. Pl. Exh. 8). The mine foreman then arrived at the job site, where the crew had been working for approximately 15-and-a-half hours, instructed both plaintiffs to leave the job site, and escorted them out of the mine. (Gilbert Dep. 17, Exh. 8; Spencer Dep. 52-53, 57).

### D. *Plaintiffs Termination*

The day after plaintiffs were escorted out of the CONSOL mine, Fenner's General Manager, Bill Machak, contacted CONSOL's mine foreman to discuss the circumstances surrounding plaintiffs' ejection. (Machak Dep., Pl. Ex. 1). The foreman told Machak that plaintiffs had been escorted out and confirmed his statement to Plaintiffs that they were not welcome to return to the CONSOL mine ever again due to

their complaints to the mine escort. *Id.* As a result of this incident, CONSOL was threatening to "remove the whole Company from the property" that evening. (D. Tate Dep. 18).

Two days later, on Wednesday, September 21, 2011, Machak had a meeting with Plaintiffs, Dave Gilbert, and Dennis Tate, Fenner's Field Supervisor (and second in command), to hear plaintiffs' side of the story. (*Id.*; Spencer Dep. 59; Whitten Dep. 116-17). Whitten confirmed that he had been planning to walk out of the mine after 16 hours regardless of whether the job was done. (Machak Dep., Pl. Exh. 1). Machak explained that plaintiffs had been escorted out of the mine due to their complaints to the CONSOL mine escort. *Id.* Machak emphasized that the plaintiffs' behavior in complaining to the mine escort was extremely unprofessional. *Id.* The focus of the meeting was on plaintiffs' behavior with respect to the mine escort and not on the substance of their complaints about their work hours, nor on their decision to walk out after 16 hours. (D. Tate Dep. 17, 19; Spencer Dep. 61-62; Whitten Dep. 117-18). Eventually, Machak told each Plaintiff that due to their unprofessional conduct and their resulting ejection and banning from the CONSOL mine, Fenner was terminating their employment. (Id.; Spencer Dep. 61-62.). Plaintiffs bipolar disorder was not mentioned during the meeting.

After the meeting, Machak prepared a written memo which discussed his understanding of the facts surrounding Plaintiffs' dismissal from the mine and the events of the meeting he held on September 21, 2011 with them. (Machak Dep., Exhibit 1). In this memo, Machak stated that he was not informed about any issues at the Blacksville mine until Sunday, September 18, 2011. *Id.* at p. 1. He further admitted that he spoke to the foreman of the Blacksville mine on Tuesday, September 20, 2011 and was

informed that Spencer and Whitten were not welcome at the Blacksville mine again. *Id.* The memo further stated that Plaintiffs were terminated "for their unprofessional actions which caused [them] to be escorted out of the mine and not allowed back at Blacksville" (Machack Dep., Pl. Ex. 1).

Thereafter, Plaintiffs filed the instant action in November 2011 in the Clinton County, OH Court of Common Pleas, alleging that Defendant discriminated against them due to their disability (bipolar disorder) in violation of Ohio Revised Code chapter 4112. Plaintiffs also assert clams of wrongful termination under Ohio law. The matter was removed to this Court on December 19, 2011, pursuant to 28 U.S.C. §1332, as there is diversity between Plaintiffs and Fenner, and the amount in controversy for the claims exceeds $75,000.00.[1] Fenner now moves for summary judgment.

**II. Analysis**

**A. Summary Judgment Standard of Review**

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ.

---

[1] Plaintiffs are individuals who are residents of Clinton County, Ohio. Fenner is a Delaware corporation. Its principal place of business is in Pittsburgh, Pennsylvania. In addition, Plaintiffs have requested a relief in the form of back pay and front pay, lost benefits, and compensatory damages for five separate causes of actions, as well as punitive damages, pre-judgment and post-judgment interest, and attorneys' fees. Thus, the remedy demanded, interest, and the award of punitive damages and attorneys' fees would cause the amount in controversy to exceed $75,000.00.

P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). It is the Plaintiff's burden to point out record evidence to support his

claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

### B. Defendant's Motion for Summary Judgment

Defendant Fenner asserts that Plaintiffs cannot establish a prima facie case of disability discrimination because they cannot show that they were qualified to perform the essential function of their positions, with or without and accommodations. Even assuming Plaintiffs could establish a prima facie case of discrimination, Fennor contends that they provided a legitimate nondiscriminatory reason for Plaintiff's termination, i.e. their unprofessional conduct at the Blacksville mine, and that Plaintiffs cannot establish pretext. Fenner further asserts Plaintiffs' cannot show that they were wrongfully terminated in violation of public policy because the evidence establish that they were terminated as a result of their unprofessional behavior not because of their complaints relating to the length of their shifts. Plaintiffs' contend that genuine issues of material fact preclude summary judgment on both claims.

### C. Defendant is entitled to Judgment as a Matter of law on Plaintiff's Disability Discrimination Claim

#### 1. *Applicable Law*

Ohio law prohibits employers from discriminating against employees based on disability. O.R.C. §§ 4112.02, 4112.99. The Supreme Court of Ohio has held that case law and regulations interpreting the Federal Americans with Disabilities Act (ADA) apply to disability discrimination claims under Ohio Revised Code Chapter 4112. *Columbus Civil Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 573, 1998-Ohio-410.

13

The Ohio Supreme Court has indicated that, in order to establish a prima facie case of disability discrimination under § 4112.02, a Plaintiff must demonstrate 1) that he was disabled, 2) that an adverse employment action was taken by his employer, at least in part, because he was disabled, and 3) that he, though disabled, can safely and substantially perform the essential functions of the job in question. *Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 302, 658 N.E.2d 738, 741 (Ohio 1996), *citing Hazlett v. Martin Chevrolet, Inc.*, 25 Ohio St.3d 279, 281, 496 N.E.2d 478, 480 (Ohio 1986). Similar to the analysis of federal employment discrimination claims, once a plaintiff establishes a *prima facie* case of disability discrimination under § 4112.02, the burden shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken. Likewise, if the employer establishes such a nondiscriminatory reason for the action taken, then the burden returns to the employee to show that the employer's stated reason is pretextual. *Id.*, *citing Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 197, 421 N.E.2d 128, 132 (Ohio 1981).

### 2. *Prima Facie Case of Discrimination*

Plaintiffs allege that they are both disabled individuals under the statute because they both suffer from bipolar disorder. Plaintiffs further assert that Fenner failed to provide a reasonable accommodation of their bipolar disorder in violation of Ohio law. Plaintiffs also contend that they were both impermissibly discharged because of their bipolar disorder. It is undisputed that Plaintiff's bipolar disorder constitutes a disability under the ADA and Ohio law. Defendant, however, contends that Plaintiffs cannot set forth a *prima facie* case of disability discrimination because they cannot demonstrate

14

that they were qualified to meet the essential functions of the job. Defendant further asserts that Plaintiffs' failure to accommodate claim fails because they cannot demonstrate that they requested a reasonable accommodation for their bipolar disorder. The undersigned agrees.

As noted above, in order to establish a *prima facie* case of disability discrimination, Plaintiffs must establish that they were able to perform the essential functions of their job. Notably, the Sixth Circuit has outlined several factors for Court's to consider in determining the essential function of an individual's job duties, including: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs. *See Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 726 (6th Cir. 2000) (quoting 29 C.F.R. § 1630.2(n)(3)).

Plaintiffs maintain that they were qualified to perform the essential functions of their jobs because they were more than qualified as evidenced by their respective promotions from helpers to Tech 2s. The job description for this position requires that they will need to "walk, sit, use their hands . . . reach with their hands and arms; stoop, kneel, crouch, or crawl . . . lift and/or move 100+ pounds, climb up to 500 feet and descend to 2,000 feet." (Doc. 40, Ex. 2). However, it is clear from the job description that the physical demands of a field tech are only one aspect of the position. (*See* Doc. 40, Ex. 2). As noted by Defendant, the job description also requires, "commitment to

15

act professionally while traveling or in the field." (Doc. 40 at pg. 37).  The position also required "solid communication skills."  (Doc. 40, Ex. 2).  Plaintiffs' interaction and verbal altercation with the CONSOL mine foreman in Blacksville violates this section of the job description.  (Doc. 40 at pg. 12; Doc. 43 at pg. 9; Whitten Dep. 106-109).

Next, in determining whether Plaintiffs are qualified to perform the essential functions of their jobs, the Court must consider whether the job can be performed with or without reasonable accommodation.  *See Brown*, 14 Fed. Appx. at 486. As noted above, the ADA prohibits discriminating "against a qualified individual with a disability," 6 42 U.S.C. § 12112(a) (2008), and defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *Id.* § 12112(b)(5)(A).  The Act defines "reasonable accommodation" to include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices ... [or] other similar accommodations for individuals with disabilities.  *Id.* § 12111(9).  An ADA plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir.2004)). "An employer, then, has the burden of persuasion to show that an accommodation would impose an undue hardship." *Hedrick*, 355 F.3d at 457. Importantly, an employee cannot force his employer to provide a specific accommodation if the employer offers another reasonable accommodation. *Id.*  If an

16

employee rejects a reasonable accommodation, the individual is no longer considered a "qualified individual with a disability."  *Id.*

Here, there is no evidence in the record that Plaintiffs made any request for a reasonable accommodation because of their bipolar disorder.  As noted above the Plaintiff Spencer testified as follows:

> Q. …Did you ever go to [the general manager] and say, "I can't work this job because of my bipolar. I need an accommodation?
>
> A. No, ma'am.
>
> Q. Why not? You didn't think you need an accommodation?
>
> A. I didn't think I needed it.

He further testified:

> Q. Did you ever ask to have your work hours limited because of your bipolar?
>
> A. No, ma'am.
>
> Q. Did you ever ask not to have to travel to mines because of your bipolar?
>
> A. No, ma'am.

 (Spencer Dep. 16).

Plaintiff Whitten likewise testified that he had never requested not to be scheduled on long jobs:

> Q. Did you ask [the scheduler] not to schedule you on long jobs?
>
> A. No, I never asked him – I asked him not to put me with certain people, but I never asked him not to schedule me.
>
> Q. Did you ever talk about not – any other way that he could make things easier for you besides not scheduling you with certain people?

> A. No. The only request I ever made was just put me with certain people
>    that did [not upset me].

(Whitten Dep. 25).

The undersigned recognizes that Whitten requested not to work with Dave Gilbert, however, there is no indication from the record that such request was made as an accommodation for Plaintiff's bipolar disorder.  (Whitten Dep. pg. 60, 1-11).  It would be unreasonable to assume an employer should know how to accommodate an individual's bipolar condition absent any specific request for an adjustment.  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998).  Notably, Whitten testified that, despite his request not to work with certain people, sometimes Fenner would "get into a position where they couldn't" and "sometimes they just got so slammed they have to.. . it just how it goes."  (Doc. 32 at 24).

Furthermore, Plaintiffs testified that due to their bipolar disorder, they would occasionally become angry or frustrated and needed time to calm down. (Spencer Dep. 15, 27; Whitten Dep. 28-29).  They both testified that when that occurred, they were free to walk away from the belt they were working on until they had settled down.  (Spencer Dep. 15; Whitten Dep. 98-99).  Here, there is no indication from the record that Plaintiffs took time to calm down and walk away from the situation (an accommodation they testified they had done in the past) before they began complaining and acting inappropriately in front of the CONSOL mine escort. In light of the foregoing, the undersigned finds that Plaintiffs fail to satisfy the second element to establish a *prima facie* case disability discrimination.

3.  *Defendant's Nondiscriminatory Reason for Termination and Pretext*

Even assuming that Plaintiff has set forth a *prima facie* case for their discrimination claims, Fenner has articulated a legitimate non discriminatory reason for their termination, *i.e.* their unprofessional behavior with respect to CONSOL, Fenner's biggest customer. *Harris v. Metro. Gov. of Nashville & Davidson Cty., Tenn.*, 594 F.3d 476, 485 (6th Cir.2010).

 As outlined by Fennor, courts have held that an employee's outburst, even when caused by a disability, is a legitimate nondiscriminatory reason for termination that will defeat a disability discrimination claim.  *See Dykes v. Wolohan Lumber, Co.*, 2007 WL 1187884 (S.D. Ohio) (granting summary judgment in favor of employer where employee with bipolar disorder became angry and frustrated with his coworkers and announced his resignation); *Burton v. Kroger Co.*, 2012 WL 1392084 (E.D. Mich.) (holding that employer had a legitimate, nondiscriminatory reason to terminate a plaintiff suffering from bipolar disorder where she had an "emotional outburst involving coworkers and customers"). *See also Neview v. D.O.C. Optics Corp.*, 382 F. Appx. 451, 460 (6th Cir. 2010) (holding that employer had legitimate, nondiscriminatory reason to discharge plaintiff where the plaintiff had outbursts in front of customers).  As explained by the Sixth Circuit, "there is a distinction between taking an adverse job action for unacceptable misconduct and taking such action solely because of a disability, even if the misconduct is 'caused' by the disability." *Martin v. Barnesville Exempted Village Sch. Dist. Bd.* of Educ., 209 F.3d 931, 934 (6th Cir. 2000) (internal citations omitted) (emphasis added).

Plaintiffs' complaints regarding their work hours, the job, and their pay in front of,

and even directly to, the CONSOL mine escort, a representative of Fenner's largest customer, were inappropriate and unprofessional.  Notably, Whitten admitted that he yelled at the mine shift foreman as he was being escorted out of the mine.  Plaintiffs' conduct clearly violated company policy.  More importantly, it is undisputed that Plaintiffs had been banned from returning to work at CONSOL's mine due to their misconduct.  The undersigned agrees with Fenner that if Plaintiffs could not work for a major mine site of Fenner's largest customer, then they could no longer perform the essential functions of their jobs.  As such, the undersigned finds that the undisputed evidence establish that Plaintiffs were terminated for a legitimate business reason.

The burden now shifts back to Plaintiff to show that the Fenner's stated reasons for their termination were pretextual.  To show that an employer's stated reasons are pretextual, a plaintiff must produce evidence that the stated reasons: (1) have no basis in fact; (2) did not actually motivate the adverse employment action; or (3) were insufficient to warrant the adverse action.  *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009); Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009).  Plaintiff may also show pretext by offering evidence which challenges the reasonableness of the employer's decision.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir.2008).  The ultimate question in every employment discrimination case is whether the plaintiff was the victim of intentional discrimination.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153 (2000). The burden of persuasion remains with plaintiff at all times.  *Harris,* 594 F.3d at 485.

Plaintiffs argues that there exists a genuine issue of material fact as to whether an overriding business justification for Plaintiffs' dismissal actually existed.  Plaintiffs

argue that Defendant's motion for summary judgment asserts that Plaintiffs were terminated because CONSOL would not permit either of them to return to any of their mines.  Plaintiffs argue, however, that no testimony from a CONSOL representative was submitted by Defendant.  According to Defendant, because CONSOL accounted for a large percentage of Defendant's business, it had no choice but to terminate Plaintiffs.  In support of this position, Defendant relies heavily on the Affidavit of Dennis Edward Tate ("D. Tate"), a Field Service Technician.  According to D. Tate, CONSOL even went so far as to consider severing its business relationship with Defendant as a result of this incident.

Plaintiff asserts that D. Tate's affidavit stands in stark contrast to many of the statements made by Machak in his termination memo as well as the statements made by the mine supervisor who escorted Plaintiffs from the mine.  Notably, in his memo, Machak indicated that when he spoke with the mine foreman for CONSOL shortly after the incident he was told that Plaintiffs were not permitted at the Blacksville mine ever again.  However, his memo does not mention any discussion about the potential severing of the business relationships between Defendant and CONSOL.  Further, his statement is void of any representation from the mine foreman that Plaintiffs were prohibited from conducting repairs at any other CONSOL mine.  Thus, Plaintiffs contend that such discrepancies establish pretext and therefore summary judgment is inappropriate.  Plaintiffs' contentions, however, fail to establish that Fenner's stated reasons for their termination had no basis in fact.

Plaintiffs appear to hang their hats on the fact that Machek's termination did not indicate that Plaintiffs were banned from all CONSOL mines and did not note that

CONSOL was considering severing its business with Fenner. As noted by Fenner, Machak's termination memorandum does not indicate that Plaintiffs were banned from all CONSOL locations because Plaintiffs were only specifically banned from working at the Blacksville mine, as the mine shift foreman indicated directly to Plaintiffs and in his telephone conversation with Machak. Fenner has never suggested otherwise. More importantly, such a ban tarnished the Company's relationship with CONSOL, the Company's largest customer. As detailed above, this alone, is sufficient to justify the Plaintiffs' termination.

Furthermore, as noted by Fenner, Machak's memorandum does not mention CONSOL's threat to cease doing business with Fenner, because the termination memorandum was a summary of Machak's investigation of the job that day, Plaintiffs' actions and the termination meeting itself. It was not a comprehensive record of every communication regarding the Plaintiffs' termination. (Machak Dep., Pl. Exh. 1.) Machak did inform the Plaintiffs that they were being terminated for their unprofessional behavior in the mine that resulted in them being ejected from the mine site and being banned from returning to Blacksville. (Machak Dep., Pl. Ex. 1).

Thus, the undersigned finds that Plaintiff's have failed to show any material discrepancy showing that Fennor's decision was a pretext for discrimination. Plaintiffs' subjective beliefs that Fennor's proffered reason is false is not sufficient to withstand summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir.1992) ("[C]onclusory allegations and subjective beliefs ... are wholly insufficient evidence to establish a claim of discrimination as a matter of law"). The record clearly reflects that Fenner's reason given for Plaintiffs' termination, their inappropriate behavior at the mine

was based in fact and was sufficient to warrant their terminations.  In light of the foregoing, the undersigned finds that Defendant is entitled to judgment as a matter of law with respect to Plaintiffs' disability discrimination claims.

**D.  Defendants are entitled to judgment as a matter of law on Plaintiffs' Wrongful Termination Claims.**

Plaintiffs also assert a claim for wrongful termination in violation of public policy. In Ohio, Plaintiffs' must prove four elements in order to establish a claim for wrongful discharge in violation of public policy:

1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Painter v. Graley* (1994), 70 Ohio St.3d 377, 384, n.8, quoting Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self–Interest Lie? (1989), 58 U. CIN. L. REV. 397, 398–399.  *See also Leininger v. Pioneer Natl. Latex*, 115 Ohio St.3d 311, 2007-Ohio-4921, ¶¶ 8–12.

With respect to the clarity element, Plaintiffs maintain that there is a clear public policy embodied in Ohio Revised Code section 4113.01 that requires workdays to be no longer than eight hours.  Plaintiffs also cite to the Fair Labor Standards Act (FLSA) which establishes a clear public policy which seeks to eliminate long working hours and working conditions that are detrimental to the health and well-being of the common

workingman.  Plaintiffs further note that the FLSA was designed to prevent long working hours and poor working conditions and designed to protect employees who refused to work under such conditions.  In light of these policies, Plaintiffs maintains that they have undeniably established the clarity element necessary to pursue their claim for wrongful termination in violation of public policy.

Next, to determine whether the jeopardy element of a wrongful termination in violation of public policy claim has been satisfied, an inquiry into the existence of alternative means of promoting the FLSA's underlying public policy is necessary.  *Wiles,* 96 Ohio St.3d at ¶ 15.  Plaintiffs contend that this element is met because no alternative avenue exists permitting Plaintiffs to challenge Defendant's indefinite work hour requirements.  Plaintiffs maintain that Fenner's punishment of Plaintiffs for objecting to long work hours and permitting dismissal of Plaintiffs under the facts represented above would jeopardize the underlying policy of the FLSA.

Defendant, however, maintains that the FLSA and corollary, the Ohio Minimum Fair Wage Standards Law, both expressly contemplate employees working more than eight-hour shifts, so long as they are paid overtime when required.  While the FLSA was enacted to "curtail" long work hours, it by no means prohibits them altogether. Instead, 29 U.S.C. § 207, which is labeled "maximum hours," provides that if an employee works more than 40 hours per week (the maximum number of hours referred to in the title), an employer must pay the employee at one and one-half his regular rate for those hours. Thus, rather than prohibiting long work hours, section 207 actually recognizes that employees may work more than 40 hours per week by requiring overtime compensation in those circumstances. There is no dispute that plaintiffs were paid overtime

compensation even when the law did not require it, such as for all weekend work, regardless of whether the employee had worked more than 40 hours during the workweek.  (Whitten Dep. 42-43).  Thus, Fenner maintains that it not only fully complied with the policy in the FLSA, but went above and beyond the statutory mandates.

Furthermore, Fenner argues that the Ohio statute does not actually prohibit long work hours; it only requires that any such work hours be agreed to by the parties.  As noted above, upon their hire, Plaintiffs were informed that their shifts would, as a rule, last longer than eight hours, and they agreed to undertake employment on this basis. (L. Tate Dep. 22-25; D. Tate Aff ¶2).  The record also shows that Plaintiffs' were employed under these working conditions for more than four years.  As such, the evidence strongly suggests that Plaintiff's routinely worked such hours.

Notwithstanding the parties' arguments with respect to the first two elements, the undersigned finds the latter two elements to be dispositive, as Plaintiffs have failed to create a genuine issue of material fact on the causation and overriding justification elements.

As detailed above, Fenner had an overriding justification for terminating Plaintiffs since Plaintiffs' behavior jeopardized Fenner's relationship with its biggest customer. *See Stephens v. Kettering Adventist Healthcare*, 182 F. Appx. 418, 423 (6th Cir. 2006) ("Because [the plaintiff] cannot establish in the context of her [discrimination] claim that [the employer's] legitimate, nondiscriminatory reason for discharging her was a pretext for discrimination, she also cannot satisfy the fourth element of the state [public policy] claim.").  *See also Kittle v. Cynocom Corp.*, 232 F. Supp. 2d 867, 874 (S.D. Ohio 2002) ("[T]he overriding justification element of the public policy tort claim correlates with the

second step of the disability discrimination analysis in which Defendant may present evidence of legitimate nondiscriminatory reasons for the termination of Plaintiff.").

Here, the evidence is undisputed that Plaintiffs' unprofessional behavior violated the duties outlined in their job description. Moreover, their actions offended CONSOL, Fenner's largest customer, to the point that Plaintiffs were actually ejected from and permanently banned from returning to one of its mines. CONSOL's undisputed complaints about Plaintiffs' extremely unprofessional conduct, even if they were limited to those made by the Blacksville mine foreman, constitute an overriding justification for Plaintiffs' discharge. *See Fitzgerald v. Roadway Exp., Inc.*, 2003 WL 22436123 (N.D. Ohio) (holding that an important customer's complaints are a legitimate reason for discharge).

Notably, the undisputed evidence establishes that during the job that led to their terminations, Plaintiffs stated that they would work for only 16 hours. (Whitten Dep. 66; Spencer Dep. 47-48). In response, David Gilbert, the lead on the job, called his Assistant Foreman, Lonnie Rollins, the senior Fenner employee on site at Blacksville at the time, and together they arranged for Rollins to help take over at the time that Plaintiffs planned to leave. (Gilbert Dep. Pl. Exh. 8). Plaintiffs were aware that a "relief crew" was coming to relieve them, since they intended to leave when the crew arrived. (Whitten Dep. 31, 81, 104). Gilbert never told the Plaintiffs that they must stay and work past 16 hours, and Gilbert never threatened them with discipline if they left the job site. Instead, Gilbert "rolled with it" (Gilbert dep. at 18) and just tried to get a clear answer from Plaintiffs as to when they were planning to leave so he could get another crew to help him finish the job, which he was able to do.

Plaintiffs repeatedly complained about the job, not only within earshot of the mine escort assigned to the crew, but also directly to the mine escort. (Whitten Dep. 90-91, 101-12; Gilbert Dep. 16-17, 25, 35; Spencer Dep. 45-46).  Both Plaintiffs understood that there was friction between the mine employees and Fenner's employees, and plaintiffs' job description required them to act professionally.  (Gilbert Dep. 36; Spencer Dep. 35; Whitten Dep. 72-73; Tate Aff. ¶2, Appendix A, job description).  Yet, Whitten continued to complain about his job, his pay rate, and Gilbert's lack of skills to his customer's representative.

The CONSOL mine escort reported Plaintiffs' complaints to his supervisor, the mine shift foreman, who went into the mine to eject Plaintiffs from the mine.  The foreman was extremely mad and he and Whitten got into, in Whitten's own words, a "heated conversation," during which Whitten yelled at him.   (Whitten Dep. 106-09). During this heated exchange, Whitten refused to answer the CONSOL foreman's questions about the job and flatly told the foreman that it "wasn't in my pay grade to answer his questions." *Id.*  The CONSOL mine foreman removed Plaintiffs from the Blacksville mine and banned both Plaintiffs from returning to that mine as a result of their behavior. (Spencer Dep. 52- 53; Whitten Dep. 108-09).

Thus, the evidence clearly establishes that Plaintiffs' were terminated as a result of their unprofessional conduct at the Blacksville mine, and not because their complaints about the long shift and associated delays and/or their purported refusal to work more than 16 hours.  Accordingly, Plaintiffs' wrongful termination claims fail as a matter of law.

### III. Conclusion

For these reasons, **IT IS THEREFORE RECOMMENDED THAT** Defendant Fenner's motion for summary judgment (Doc. 40) be **GRANTED** and this case is therefore **TERMINATED** on the active docket of the Court.

_s/ Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT WHITTEN et al,

      Plaintiff,                                      Case No. 1:11cv889

vs.                                             Judge Weber
                                             Magistrate Judge Bowman

FENNOR DUNLOP CONVEYOR
SYSTEMS AND SERVICES, INC.,

      Defendant.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).